**SONFAST CORPORATION, Plaintiff,**

v.

**YORK INTERNATIONAL CORPORATION, Defendant.**

**Civ. A. No. CV–93–0904.**

United States District Court, M.D. Pennsylvania.

Sept. 21, 1994.

Steven M. Hovis, Timothy Paul Ruth, Stock and Leader, York, PA, for plaintiff Sonfast Corp.

John McN. Cramer, Reed, Smith, Shaw & McClay, Harrisburg, PA, for defendant York Intern. Corp.

## MEMORANDUM

RAMBO, Chief Judge.

### I. Introduction

Before the court is Defendant's motion for complete summary judgement in this action.

Plaintiff's claims against Defendant are asserted in six separate counts. Counts I, III, and V assert breach of contract claims; Count II asserts claims for incidental and consequential damages; Count IV asserts a fraudulent misrepresentation claim; and, Count VI asserts a claim for punitive damages. Briefs have been filed and the motion is ripe for disposition.

### II. Background

The facts stated herein are undisputed by the parties unless otherwise noted.

Sonfast Corporation ("Sonfast") is a supplier of commercial and industrial fasteners. York International Corporation ("York") is a manufacturer of cooling and air conditioning equipment. York utilizes an assortment of fasteners to assemble its products.

Through a letter prepared by Sonfast dated December 15, 1986, attached in Appendix D of Defendant's Brief, Sonfast and York entered into a "Fastener Purchasing Agreement" ("Agreement"). Under the Agreement Sonfast was to supply fasteners to the Central Environmental Systems ("CES") division of York, and York was to purchase all of its requirements for such fasteners from Sonfast. Sonfast was to supply CES plants located in Norman, Oklahoma; Elyria, Ohio; and Madisonville, Kentucky. The agreement covered a period ending December 31, 1991. An addendum dated October 14, 1988 extended the term of the Agreement through December 31, 1989; and an addendum dated January 1, 1990 extended the term of the agreement through December 31, 1993.

Under ¶ 14 of the Agreement, York retained the right to terminate [1] the Agreement should Sonfast's performance fall below

---

1. Within the Agreement, the parties refer to "cancellation" rather than "termination." The terms seem to be interchangeable; however, the Pennsylvania Commercial Code makes an important distinction between the two terms. According to the code:

(c) 'Termination' occurs when either party pursuant to a power created by agreement ... puts an end to the contract otherwise than for its breach. On 'termination' all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives....

(d) 'Cancellation' occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of 'termination' except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance.

13 Pa.Cons.Stat.Ann. §§ 2106(c)–(d) (1984). Because the instant case involves termination rather than cancellation, the court will use the term "termination clause" when referring to ¶ 14 of the Agreement.

certain acceptable standards. Paragraph 14 states: "CANCELLATION: This agreement is subject to cancellation in whole or in part should Sonfast's performance significantly fall below minimum acceptable levels with regard to pricing, delivery, quality or service." Nothing in the agreement expressly sets forth what an "acceptable level" means. Furthermore, the agreement is silent as to the appropriate procedure for termination and whether this procedure included notifying Sonfast of the decision to terminate.

During the third quarter of 1991, Terry L. Bowman, York's Director of Purchasing, became concerned that Sonfast's prices were excessive and their service below the acceptable standard set by the agreement. To gauge the current market price of the fasteners, Bowman sought price quotations for comparable fasteners from other manufacturers. According to Mr. Bowman's deposition, the quotations were lower than the current price being charged by Sonfast. York then notified Steven H. Yount, Sonfast's Vice President in charge of sales, that it intended to solicit bids for the supply of fasteners to the CES division, the order that Sonfast had the exclusive contract to fill through December 1993. York did not notify Sonfast that its performance under the agreement had fallen below acceptable standards thereby triggering the termination clause of the agreement. Sonfast was advised by York that the bidding would cover a larger range of fasteners than what was currently being provided by Sonfast under the agreement. Further, Sonfast was advised that if it would agree to give up its right to be the exclusive CES supplier until December 1993, Sonfast would be permitted to submit a bid for the new supply arrangement. If Sonfast chose not to submit a bid, it would remain the exclusive CES fastener supplier until December 1993, pursuant to the Agreement, but would relinquish the opportunity to continue to be a supplier after that date. Sonfast submitted a bid. The defense contends that Sonfast voluntarily relinquished its right to supply the CES division through December 1993, when it submitted the bid. Sonfast contends that did not voluntarily consent, but rather, entered the bidding process under economic duress.

On or about February 7, 1992, York requested bids from seven suppliers. The bidding process was to be governed by York's bid rules. Each supplier was given a copy of the bid rules in February when their bid was initially requested. The rules expressly provided that in addition to the bid itself, the proposal should also contain a proposed delivery plan. Additionally, separate "Incumbent Bidding Rules" set forth the rules which specifically applied only to Sonfast's bid. The incumbent bidding rules gave some preferences to the incumbent bidder, provided that the incumbent's delivery and services had been of acceptable quality over the previous year, and provided that their prices had remained competitive. Five of the seven suppliers submitted bids by the March 12, 1992 deadline. With the exception of Sonfast, each of the bids also included a delivery plan proposal. Sonfast and Tebco produced the two lowest bids. Sonfast's bid was marginally lower than Tebco's (25.3% below standard cost versus 25.9% below standard cost). However, York judged the Tebco bid to be superior, as Tebco had provided a formal in-plant stocking plan while Sonfast had provided no comparable written plan. In his deposition, Mr. Bowman stated that Sonfast had provided oral assurances that it would make any changes necessary to retain the CES contract.

In a letter dated June 11, 1992, York informed Sonfast that it would continue to purchase fasteners from Sonfast to exhaust the inventory that Sonfast had already acquired to service the York account. The letter confirmed that York understood that this "phase-out" might not be completed until December 1992. A hand written notation at the bottom of the letter indicates that it was the intent of the parties to "zero" the existing inventory of "special" products by December 1992. The notation makes an express distinction between "special" and "standard" products. York continued to purchase fasteners from Sonfast through December 1992, at which time York determined that it had purchased all reasonable invento-

ry existing on March 12, 1992.[2] Sonfast disputes the assertion that all reasonable inventory was purchased and contends that York did not proceed in good faith with respect to the "phase-out."

A second breach of contract claim also arises from the CES Agreement. This claim involves Sonfast's relationship with York's Madisonville plant, one of the plants supplied under the CES Agreement. In 1987 York elected to discontinue using Sonfast as a supplier for its Madisonville plant due to problems it encountered when using the fasteners in certain thin sheet metal applications. York contends that Sonfast was unable to provide a fastener that would work properly when used in the thin sheet metal applications. Sonfast disputes York's assertion. According to Plaintiff, in response to Defendant's complaint about the fastener, it developed plans for a new fastener that could be used for the thin sheet metal applications. Sonfast contends that York committed to a new supplier despite this plan. Additionally, Sonfast claims that York violated the exclusivity clause of the Agreement by ordering all # 15519 fasteners from another supplier, rather than just the quantities that would be used in thin sheet metal applications. The parties are in dispute as to whether the Madisonville plant used the # 15519 fasteners in applications other than the thin sheet metal applications. York contends that even if the fasteners were used in other applications, there is no language in the contract to support Sonfast's assertion regarding the need to split fastener orders.

Finally, also central to this dispute, is a second concurrent relationship between York and Sonfast. Through this relationship, Sonfast supplied fasteners to York's Applied Systems Division ("ASD") in York, Pennsylvania from approximately October 1987 through December 1992. There is a dispute as to whether this ongoing relationship was governed by any type of contract. Defendant contends that no contract ever existed and that it resisted Plaintiff's attempts to execute a written sales agreement. Plaintiff claims that a formal contract similar to the CES Agreement was executed by the parties. However, in his deposition Mr. Pappy admits that he has been unable to locate a copy of the alleged contract. Regardless of the existence of a formal contract, Plaintiff further asserts that the relationship was also governed by the "Incumbent Bidding Rules." In his deposition, Mr. Pappy contends that Richard J. Hoover, an executive at York, orally advised him that the relationship would be governed by the Incumbent Bidding Rules. Defendant asserts that such rules were never intended nor understood to be a binding contract, and that no binding contract exists.

In Count I of the complaint, Plaintiff claims that York breached the Agreement by awarding the CES fastener supply contract to Tebco. This claim is based on Sonfast's assertion that at no point during its relationship with York did its performance fall below acceptable standards. Thus, the award of the contract to Tebco breached the exclusivity clause of the Agreement and denied Sonfast the right to receive profits under the contract. Furthermore, Sonfast contends that it never freely consented to a modification of the original Agreement.

Count II of the complaint requests that the court award incidental and consequential damages for costs incurred by Sonfast because of the termination of the Agreement. First, Plaintiff requests incidental damages for the fasteners in inventory that York refused to purchase during the "phase-out" period. Additionally, in the complaint Plaintiff avers that it entered into a number of long term contracts to "insure its continued compliance under the Agreement." However, in his deposition Mr. Pappy stated "there are no contracts or leases that exist that are directly related to complying with the terms of the agreement." He clarified this statement by explaining that the contracts to which he was referring were the result of "business and economical justification[s]" related to the York account. Plaintiff asserts that because the Agreement was terminated

---

**2.** March 12, 1992 was the date on which Sonfast lost the competitive bid for the new York contract.

prematurely, these contracts have caused it to suffer damage.

In Count III, Plaintiff asserts a second breach of contract claim based on the CES agreement. Plaintiff alleges that Defendant violated the exclusivity clause of the Agreement, and thereby breached the contract, by purchasing some fasteners for the Madisonville plant from a supplier other than Sonfast.

Count IV is a misrepresentation claim. Plaintiff asserts that Defendant falsely represented that it would purchase remaining Sonfast inventory originally ordered prior to March 1992 to service the York account. The claim further states that in reliance on this misrepresentation, Sonfast delayed exercising its rights against York for the alleged breach of the agreement. Plaintiff contends that its detrimental reliance on the misrepresentation caused it to suffer damages.

In Count V, Plaintiff asserts a third breach of contract claim. This claim relates to Sonfast's relationship with the Applied Systems Division of York. Sonfast alleges that it had a binding supply contract with ASD that was breached when ASD terminated Sonfast and sought other suppliers in December 1992.

Finally, in Count VI, Plaintiff requests that the court award punitive damages for misrepresentation claim alleged in Count IV.

## III. *Discussion*

The court prefaces its discussion of the merits of this case with an acknowledgment of the convoluted and confusing nature of the facts of this case. Despite efforts by both parties to clearly and succinctly present the facts, the court has taken a substantial amount of time reorganizing the facts with the hope of presenting the case in a more coherent manner.

At the outset, it is beneficial to note how each Count of the complaint relates to the alleged agreements between the parties. The written contract between Sonfast and the York Central Environmental Systems division is at issue in Counts I, II, III, and IV. The CES Agreement controlled Sonfast's provision of fasteners to three York plants located in Madisonville, Kentucky; Norman, Oklahoma; and Elyria, Ohio. The entire Agreement is at issue in Counts I, II, and IV, while Count III focuses solely on Sonfast's relationship with the CES Madisonville plant. An alleged written agreement between Sonfast and the York Applied Systems Division is at issue in Count V. Finally, Count VI requests punitive damages for the misrepresentation claim alleged in Count IV.

### A. Standard of Review

The court will consider this motion under the accepted standards for the award of summary judgment under Rule 56 of the Federal Rules of Civil Procedure. In *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987), the United States Court of Appeals for the Third Circuit succinctly stated the applicable standards for summary judgment:

> Summary judgment may be entered if "the pleadings, deposition[s], answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, [248,] 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Equimark Comm. Finance Co. v. C.I.T. Financial Serv. Corp.*, 812 F.2d 141, 144 (3d Cir. 1987). If the evidence is "merely colorable" or "not significantly probative" summary judgment may be granted. *Anderson*, [477 U.S. at 249] 106 S.Ct. at 2511; *Equimark*, 812 F.2d at 144. Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574 [586], 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

*Id.* Once the moving party has shown an absence of evidence to support the claims of the nonmoving party, the nonmoving party must do more than simply sit back and rest on the allegations of the complaint. Specifically, the nonmoving party must "go beyond the pleadings and her own affidavits, or by the 'depositions, answers to interrogatories,

and admissions on file' and designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the nonmovant bears the burden of persuasion at trial, "the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden at trial." *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.1987), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

## B. The CES Division Fastener Purchase Agreement

Defendant asserts that summary judgment must be granted with respect to Counts I, II, III on several grounds. In response to Counts I and III, Defendant claims that there was no breach of the Agreement between CES and Sonfast. Rather, with respect to Count I, Defendant claims that the Agreement was subject to a valid modification by the parties. In response to Count III, Defendant asserts that the contract was terminated, not breached. Finally, Defendant asserts that it is entitled to summary judgment on Count II as Plaintiff may not be awarded consequential damages as a matter of law. The court will deny Defendant's motion for summary judgment as to Counts I and III, and will grant partial summary judgment to Defendant as to Count II.

### 1. Count I

■ Judge Posner once aptly noted that with respect to the provision of the Uniform Commercial Code governing modification, "[t]he meaning of this provision and its proviso is not crystalline and there is little pertinent case law." *Wisconsin Knife Works v. Nat'l Metal Crafters,* 781 F.2d 1280, 1284 (7th Cir.1986). The court today finds itself faced with a similar absence of germane case law. Where state law is undeclared or not current on a given issue, the "obligation of [the] federal court applying state law is to discern [the] most probable state of current law for the outcome of the litigation in the federal court should be substantially [the] same ... as it would be if tried in a state court." *Aluminum Co. of Am. v. Essex*

*Group, Inc.,* 499 F.Supp. 53, 60 (W.D.Pa. 1980).

■ In an action for breach of contract, plaintiff carries the burden of proving the breach. Where defendant asserts modification as a defense, the burden shifts to defendant to prove a valid modification. *See Wisconsin Knife Works,* 781 F.2d at 1285. The party with the burden of proving modification must do so by a preponderance of the evidence. *Id.* "Where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Resolution Trust Corp. v. Gill,* 960 F.2d 336, 340 (3d Cir.1992). Additionally,

> [i]n determining whether the movant has satisfactorily established that there is no genuine issue of material fact, courts must keep in mind that 'inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.'

*Rosen v. Bezner,* 996 F.2d 1527, 1530 (3d Cir.1993). Consequently, Defendant has the burden of showing that there is no genuine issue of fact, regardless of the quality or quantity of evidence submitted by Plaintiff, and where all inferences are drawn in favor of Plaintiff. Despite a laudable effort, Defendant has failed to overcome this significant burden.

In the instant case, Defendant has presented evidence that Plaintiff agreed to modify the Agreement by changing the duration of the Agreement. Plaintiff, likewise, has presented evidence that it did not consent to the modification. Moreover, conflicting evidence has been presented with respect to the terms of the alleged oral modification. For example, the parties do not agree on the terms of the proposed "phase-out" of Sonfast. More specifically, the parties differ as to what Sonfast inventory York was required to purchase during the "phase-out." Hence, there are genuine questions of fact as to both whether a valid modification actually occurred, and what the precise terms of the alleged modification were. "[I]t is well-settled that where

conflicting evidence is presented concerning parol modification of a contract, it is within the province of the jury to define it's terms." *Noble C. Quandel Co. v. Slough Flooring, Inc.*, 384 Pa.Super. 236, 558 A.2d 99, 101 (1989). Furthermore, even if this court could discern the actual terms of the modification, the issue of whether Plaintiff consented to the modification either expressly, or impliedly through its conduct, is a question of fact for the jury to decide. Therefore, the court must deny Defendant's motion for summary judgment as to Count I of the complaint.[3] Having denied the motion for summary judgment, the court has no occasion to reach the merits of any of Plaintiff's arguments denying a valid modification.

## 2. Count II

■ In Count II Plaintiff requests an award of incidental damages as well as an award of consequential damages to compensate it for losses it incurred as a result of the alleged breach. While there are genuine questions of fact with respect to the breach and the incidental damages claim, the court may dispose of the issue of consequential damages without resolving the issue of whether a breach occurred. Central to the issue of damages in the instant case is the subtle distinction between incidental and consequential damages. Under the Pennsylvania Commercial Code,

> [i]ncidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

13 Pa.Cons.Stat.Ann. § 2710 (1984); *see Intermeat, Inc. v. Am. Poultry Inc.*, 575 F.2d 1017, 1024 (2d Cir.1978) (discussing New York's identical Code provision). Consequential damages are the damages that the aggrieved seller incurs through his relations with third parties. *Intermeat*, 575 F.2d at 1024. Plaintiff has the burden of presenting

proof of damages. *Solor Electric Corp. v. Exterminator Corp. of Am.*, 384 Pa. 233, 120 A.2d 533, 534 (1956). Furthermore, "where damages are susceptible of being proved the amount must be established with certainty." *Id.*

■ In the instant case, Plaintiff asserts two grounds upon which to base a damage award. First, Plaintiff seeks incidental damages for the value of fasteners, in inventory at the time of the termination of the Agreement, that would have been purchased by York had York not terminated the Agreement. Plaintiff and Defendant dispute whether any leftover inventory actually exists. The court finds little evidence on the record to substantiate this claim. As proof of damages, Plaintiff has presented Mr. Pappy's deposition testimony indicating that he has begun to calculate the amount of damages in his head. The deposition also makes reference to the difficulty that Sonfast is having in documenting the exact level of "leftover" inventory. At trial, such evidence in itself would be insufficient to constitute clear evidence of damages. Although the court would like to dispose of this issue, a "grant of summary judgment on the sole basis of absence of provable damages ... is generally improper" since nominal damages could be awarded at trial. *Thorsen v. Iron & Glass Bank*, 328 Pa.Super. 135, 476 A.2d 928, 932 (1984) (affirming lower court's decision to grant summary judgment on other grounds). Because there is insufficient evidence before the court to dispose of the issue of incidental damages at this stage, the court will deny Defendant's motion for summary judgment as to this issue. Plaintiff is advised that at trial it will have the burden of proving damage to a degree of reasonable certainty. *Polish Am. Mach. Corp. v. R.D. & D. Corp.*, 760 F.2d 507, 531 (3d Cir.1985).

■ Plaintiff's second request for damages within Count II, prays that the court award damages for the value of contracts that Plaintiff entered into with third parties "to insure its continued compliance under the

---

3. Having found genuine issues of fact to exist as to the terms and validity of the modification, the court does not reach the issue of whether the modified contract, if valid in all other respects,

satisfies the Pennsylvania Commercial Code's statute of frauds provision. *See* 13 Pa.Cons.Stat. Ann. § 2209(c) (1984) (modified contract must comply with the statute of frauds).

Agreement."[4] In substance, Plaintiff has asked the court to award consequential damages. Such damages "[d]o not arise within the scope of the immediate buyer-seller transaction but rather stem from the losses incurred by nonbreaching party in its dealings, often with third parties, which were reasonably foreseeable by breaching party at time of contracting." *Petroleo Brasileiro, S.A. Petrobras v. Ameropan Oil Corp.*, 372 F.Supp. 503, 508–09 (E.D.N.Y.1974) (citations omitted). It is well settled under Pennsylvania law that an aggrieved seller may not be awarded consequential damages under the Pennsylvania Commercial Code. *Associated Metals & Materials Corp. v. Sharon Steel Corp.*, 590 F.Supp. 18 (S.D.N.Y.), *aff'd* 742 F.2d 1431 (2d Cir.1983) (applying Pennsylvania law); *Atlantic Paper Box Co. v. Whitman's Chocolates*, 844 F.Supp. 1038, 1046 (E.D.Pa.1994); *see* 13 Pa.Cons.Stat.Ann. §§ 2703 *et seq.* (1984) (seller's remedies for breach of contract). The court finds that as a matter of law, Plaintiff is not entitled to recover consequential damages. Therefore, the court will grant Defendant's motion for summary judgment on Count II with respect to this issue.

### 3. Count III

In Count III of the complaint, Plaintiff claims that Defendant breached the exclusivity clause of the agreement by purchasing # 15519 fasteners for its Madisonville plant from a source other than Sonfast. Defendant asserts that the Sonfast fasteners were ineffectual in thin sheet metal applications, and that it was forced to turn to another supplier for suitable fasteners. Plaintiff counters by asserting that even if the fasteners could not be used in the thin sheet metal applications, Defendant should have purchased the Sonfast fastener for all other applications. Defendant contends that there is no clause in the contract requiring it to split its order of fasteners where Sonfast fasteners do not function in the primary application for which Defendant uses them.

The issue is whether the contract requires York to purchase all # 15519 fasteners not used in thin sheet metal applications from Sonfast.

Construction of a contract for sale is a matter of law to be decided by the court. *See Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991). Under Pennsylvania law, the primary consideration in construing a contract is the parties' intent. *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 389 (1986); *Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 476 A.2d 1, 5 (1984). When the terms of the contract are clear and unambiguous, the intent should be determined from the language of the contract itself. *Metzger*, 476 A.2d at 5. However, where terms of the contract are ambiguous, parole evidence may be relied on to clarify the ambiguity. *Hutchison*, 519 A.2d at 390; *Metzger*, 476 A.2d at 5. Evidence of well-established industry custom is always relevant to aid the court in determining the intent of the contracting parties. *Leslie v. Pennco, Inc.*, 323 Pa.Super. 23, 470 A.2d 110, 113 (1983).

A contract term is ambiguous if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison*, 519 A.2d at 390. Whether an ambiguity exists is a question of law for the court, but the resolution of conflicting parole evidence as to the parties' intent is a question of fact for the jury. *Id.*

At this juncture, the court notes that both parties have failed to address an issue related to the termination. The Pennsylvania Commercial Code requires notification to be given prior to termination. *See* 13 Pa.Cons. Stat.Ann. § 2309(c) (1984); *International Therapeutics, Inc. v. McGraw–Edison Co.*, 721 F.2d 488, 491 (5th Cir.1983) (discussing identical provision of the Texas Business and Commercial Code). This notification requirement can be waived "where the contract provides for termination on the happening of

---

4. Again, the court notes that the Plaintiff has presented no evidence with respect to these alleged contracts and leases. Plaintiff's brief does not detail the number and nature of these contracts and leases, nor did Plaintiff include copies

of these instruments in the exhibits attached as an appendix to its brief. Plaintiff is again reminded that a court may not award damages based upon what it imagines contracts not before it to say.

an 'agreed event,' " § 2309, cmmt. 10. Paragraph 14 of the Agreement speaks of such an "agreed event." However, the language describing the event ("fall below minimum acceptable levels") is not sufficiently clear for the court to be able to construe the terms. To decide whether ¶ 14 places the contract within the exception to the notification requirement, the court will have to ascertain the intent of the parties, as well as common standards within the industry with respect to acceptable levels of quality. The parties may wish to consider this issue before trial.

■ The seminal issue that remains unresolved is whether or not the Agreement obligated Defendant to split his fastener order; ordering fasteners for the thin sheet metal applications from a third party, while retaining Plaintiff as supplier of all # 15519 fasteners used for other applications. The court finds that as a matter of law, ¶ 14 of the Agreement is ambiguous as to this issue. It is unclear whether the parties intended the partial termination language of ¶ 14 to mean that Defendant was required to split fastener orders where the fastener fell below minimum quality levels with respect to only one of the applications for which it was used. Furthermore, a factual dispute remains as to whether the Madisonville plant used the fasteners for other than the thin sheet metal applications.

Defendant claims in its reply brief that Plaintiff has failed to produce admissible evidence on this point, since Plaintiff's "understanding" of the uses of fasteners at the Madisonville plant is not relevant. Federal Rule of Civil Procedure 56(e) states that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). In his affidavit, Mr. Yount stated that it was his "understanding" that there were other applications for which the Madisonville plant could have used the # 15519 fasteners. At this time, the court refuses to quibble over the word "understanding." Admittedly, the language of the affidavit is less lucid than the court or Defendant might prefer. However,

as Mr. Yount serviced the York account for a number of years, there is clearly a basis for him to have personal knowledge of the applications for which the # 15519 fastener was utilized by the Madisonville plant. At trial the onus will be on Plaintiff to prove that the basis for Mr. Yount's statement was personal knowledge rather than inadmissible hearsay. Based upon the foregoing, the court will deny Defendant's motion for summary judgment as to Count III.

## C. Misrepresentation and Punitive Damages

### 1. Count IV

■ Plaintiff asserts a claim of misrepresentation in Count IV based upon the "phase-out" of the Agreement during the fall of 1992. Under Pennsylvania law, Plaintiff has the burden of proving all elements of fraudulent misrepresentation by clear and convincing evidence. *Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Inv.*, 951 F.2d 1399, 1409 (3d Cir.1991). The five elements of misrepresentation are:

(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result.

*Id.* Whether a prima facie case of fraudulent misrepresentation has been properly alleged is a question of law for the trial judge to decide. *Id.* (quoting *Beardshall v. Minuteman Press Int'l, Inc.*, 664 F.2d 23, 26 (3d Cir.1981)). " '[P]romises to do future acts do not constitute a valid fraud claim.' " *Id.* at 1409 (quoting *Wood v. R.R. Donnelley & Sons Co.*, 888 F.2d 313, 318 (3d Cir.1989). Moreover, in *Wood*, the court noted that "a breach of faith or an agreement regarding the doing or refraining from doing something in the future is not fraud." *Wood*, 888 F.2d at 319. As a matter of law, Plaintiff has failed to meet its burden of presenting clear, precise and convincing evidence to allege a *prima facie* case of misrepresentation. *See Mellon*, 951 F.2d at 1409.

Viewing the facts before the court in a light most favorable to the nonmoving party

(Plaintiff), the court finds that Plaintiff has failed to show a misstatement of present intent on the part of York, and that Plaintiff has failed to allege damage as a proximate result of its reliance on a misrepresentation. In a letter dated June 11, 1992, York stated its intent to "work with Sonfast to use [the] inventory" that had been ordered by Sonfast prior to March 12, 1992 to service the York account. As this statement pertained to a gradual "phase-out" of Sonfast as a supplier, with the entire "phase-out" potentially spanning several months, the statement was a promise to act in the future rather than a statement of present intent. Thus, while York's alleged failure to honor its promise regarding the "phase-out" may have been in bad faith, it cannot be characterized as a misrepresentation. Therefore, as a matter of law, Plaintiff has failed to show a misrepresentation upon which to base its claim.

Assuming arguendo that Plaintiff did properly allege a misrepresentation, it has also failed to show that it was damaged as the result of justifiably relying on the misrepresentation. In the complaint, Plaintiff claims that it "delayed in exercising its rights against York International under the Agreement for York International's breach of said Agreement" in reliance on York's assertion that it would purchase the remaining inventory. Plaintiff has failed to present any evidence demonstrating how it was harmed by this delay. To the contrary, as this action involves the very breach of contract claims that Plaintiff claims it delayed filing, the court fails to see how Plaintiff was harmed by the delay. The court is not free to speculate how Plaintiff may have been harmed absent any evidence on the record that demonstrates harm. Thus, as a matter of law, Plaintiff has failed to state a *prima facie* case of fraudulent misrepresentation. Defendant's motion for summary judgment as to Count IV will be granted.

### 2. Count VI

In Count VI of the complaint, Plaintiff claims that it is entitled to punitive damages stemming from the misrepresentation claim. As the court has disposed of the misrepresentation claim, there is no longer any basis for the claim for punitive damages. The court therefore will grant Defendant's motion for summary judgment as to Count VI.

### D. Applied Systems Division Contract: Count V

■ In Count V of the complaint, Plaintiff asserts a third breach of contract claim. Specifically, Plaintiff alleges that Defendant breached a sales contract, between Sonfast and York's Applied Systems Division ("ASD"), by terminating Plaintiff as supplier both without cause and without allowing Plaintiff to participate in a competitive bid for the new contract. Defendant claims that there was no breach because the sales relationship between the two parties was never governed by a contract. The issue before the court on summary judgment is whether the relationship was governed by a contract; and, if there was a contract, whether that contract was breached by York. The court finds that as a matter of law, no contract existed between the parties. Because the court finds that a valid contract did not exist, the court necessarily does not reach the question of whether the contract was breached.

According to the Pennsylvania Commercial Code:

(a) General Rule.—Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.

13 Pa.Cons.Stat.Ann. § 2201(a) (1984). Plaintiff first claims that the ASD relationship was governed by a written agreement similar to the CES agreement. In his deposition, Mr. Pappy alluded to a written agreement between the two parties, but stated that he had been unable to find a copy of the agreement. This is the only evidence Plaintiff puts forth as proof that a contract existed. Defendant claims that although on several separate occasions Plaintiff requested that a written contract be signed, Defendant never consented to signing a sales contract. In support of its claim, Defendant has pro-

duced evidence of a sales contract signed by a Sonfast representative but missing the signature of a York representative. The court finds that Plaintiff has failed to produce evidence of a written sales contract between the parties.

In the alternative, Plaintiff asserts that the "Incumbent Bidding Rules" served as a binding contract between the parties. The language of the rules is arguably sufficient to support the assertion that there was a contract between the parties. However, the rules were not signed by York, the party against whom enforcement is sought. Therefore, as a matter of law, the "Incumbent Bidding Rules" are insufficient to serve as a contract between the parties. Because no other legally sufficient writing evidencing a contract has been submitted to the court, the court must find that there was no binding long-term sales contract between the parties. As no contract existed, Plaintiff has no action for breach of contract. Defendant's motion for summary judgment will be granted as to Count V.

#### IV. *Conclusion*

In response to Defendant's motion for complete summary judgment, the court will grant Defendant's motion as to Counts IV, V, and VI; will deny Defendant's motion as to Counts I and III; and will grant partial summary judgment as to Count II.

An appropriate order will be issued.

#### ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT** Defendant's motion for summary judgment is **GRANTED** in part and **DE-NIED** in part, as follows:

1) Defendant's motion as to Counts IV, V, and VI is **GRANTED;**

2) Defendant's motion as to Counts I and III is **DENIED;**

3) Defendant's motion as to Count II is **GRANTED** as to Plaintiff's claim for consequential damages and is **DENIED** as to Plaintiff's claim for incidental damages; and

4) The Clerk of Court shall defer the entry of judgment until the conclusion of this case.